**BRISTOL–MYERS SQUIBB COMPANY, Plaintiff,**

v.

**RHÔNE–POULENC RORER, INC.,** Centre National De La Recherche Scientifique, **and Rhône–Poulenc Rorer, S.A., Defendants.**

No. 95 CIV. 8833(RPP).

United States District Court, S.D. New York.

April 27, 1999.

Fitzpatrick, Cella, Harper & Scinto, by Thomas H. Beck, New York City, for Plaintiff.

Rogers & Wells LLP, by Philip E. Roux, New York City, for Defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

By letters dated April 17, 1998 and May 5, 1998, Rhône–Poulenc Rorer, Inc. ("RPR") requests reconsideration of this Court's opinion and order dated March 31, 1998 relating to the French patent agent privilege, *Bristol–Myers Squibb Co. v. Rhône–Poulenc Rorer, Inc.*, No. 95 CIV. 8833(RPP), 1998 WL 158958 (S.D.N.Y. April 2, 1998). In that opinion and order, the Court found that French patent agents are not entitled under French law to an evidentiary privilege comparable to the attorney-client privilege as it is enjoyed by patent attorneys under United States law. As a result, the Court held that unless RPR's French patent agents were acting under the authority of an American attorney, the French patent agents' communications and memoranda were not privileged. 1998 WL 158958, at *3. RPR's request for reconsideration of this opinion and order was opposed by letters from Bristol–Myers Squibb Co. ("Bristol") dated April 24, 1998 and May 7, 1998. After oral argument, the Court ordered a hearing on December 2–3, 1998, at which both sides presented expert testimony on foreign patent agent secrecy law.

For the reasons that follow, the Court finds that neither the evidence produced at the hearing nor any submissions by the parties provides a basis for disturbing the March 31, 1998 opinion and order.

### PROCEDURAL BACKGROUND

The Court's March 31, 1998 opinion and order was, itself, decided on a motion to reconsider an earlier opinion and order dated February 6, 1998. The February 6, 1998 opinion and order, *Bristol–Myers Squibb Co. v. Rhône–Poulenc Rorer, Inc.* No. 95 CIV. 8833(RPP), 1998 WL 51847 (S.D.N.Y. Feb. 9, 1998), found that communications and memoranda prepared by RPR's French patent agents, Jacques Pilard and Jacques Savina, were protected from discovery on three grounds: (1) Pilard and Savina were in-house patent agents qualified to prepare and prosecute French and European patent applications and to render legal advice with respect to French and European patent matters, which French law protects from discovery; (2) Pilard and Savina, as employees of RPR, were performing duties such as gathering, analyzing and transmitting factual and technical information at the request of RPR's outside patent agents and patent attorneys, which qualified them as "agents ... responsible for directing [the company's] actions in response to legal advice" entitled to protection under *Upjohn Co. v. United States*, 449 U.S. 383, 391, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); and (3) since 1975 all of Pilard's and Savina's activities were conducted pursuant to a research collaboration and patent agreement with L'Université Joseph Fourier and the Centre National De La Recherche Scientifique, thereby entitling them to the protections of the attorney-client privilege for communications between counsel and clients under the community of interest doctrine as elaborated in *In re Regents of the University of California*, 101 F.3d 1386, 1389 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1193, 117 S.Ct. 1484, 137 L.Ed.2d 695 (1997). *Bristol–Myers*, 1998 WL 51847, at *1. The Court found that exceptions to the general finding of privilege might apply to the documents of Dr. Ojima, a professor at the State University of New York; documents relating to Bristol's crime-fraud defense; and documents relating to statements made by the inventors in applying for the '277 patent reissue. *Id.* at *2. The Court ordered, with respect to communications to or from Pilard or Savina, that RPR identify on its privilege log the relevant patent or patent application and prior art so that Bristol could make a determination "as to whether Pilard and Savina were or were not engaged in providing legal advice with respect to French or European patent matters or were or were not acting as gatherers of factual and technical information at the instructions of outside

patent attorneys in the United States." *Id.* at *2.

On March 31, 1998, the Court granted a motion for reconsideration of its February 6, 1998 opinion and order, and held that the communications to and from RPR's French patent agents were not entitled to the attorney-client privilege. The Court adopted the position that "[i]f a communication with a foreign patent agent involves a foreign patent application, then as a matter of comity, the law of that foreign country is considered regarding whether the law provides a privilege comparable to the attorney/client privilege." *Bristol–Myers*, 1998 WL 158958, at *1. The Court found that French patent agents have a duty to preserve the confidences of their clients, grounded in Article 422–54 of the French Intellectual Property Code, which applies to patent agents and states that they "must obey professional secrecy," and in Article 378 of the French Penal Code, which states:

> [P]ersons who are depositories, by their condition or profession or by temporary or permanent duties, of secrets which are entrusted to them, who, except in cases where the law obliges or authorizes them to be informers, shall have revealed such secrets, shall be punished by imprisonment of one month to six months and by a fine of 500 to 3,000 francs.

*Id.* at *1–*2.[1] The Court noted, however, "the fact that a statute requires a party to keep clients' affairs secret does not mean that a privilege exists," *id.* at *3, and it concluded that, in fact, no evidentiary privilege covers French patent agents, *id.* The Court based this conclusion on Article 12.3 of the French regulations concerning the professional secrecy obligations of French patent agents, which states that "[t]he professional secrecy rules are not enforceable either against persons legally empowered to conduct judicial, administrative or customs investigations, or against courts of legal jurisdiction." *Id.* at * 2.[2] The Court likened the French professional secrecy obligation to that of bankers and telephone companies in this country, which requires such entities to abstain from divulging secrets of their clients' affairs absent court process. *Id.* at *3. The Court found that the French patent agent requirement of secrecy was not comparable to the attorney-client privilege in this country, and that "unless the French patent agents were acting under the authority of a U.S. attorney, the French patent agents' communications are not entitled to the protections afforded the attorney-client privilege in this country and, thus, are not entitled to comity." *Id.* at *3 (citing *Status Time Corp. v. Sharp Elecs. Corp.*, 95 F.R.D. 27, 31–33 (S.D.N.Y.1982); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 519 (S.D.N.Y.1992); *Glaxo, Inc. v. Novopharm Ltd.*, 148 F.R.D. 535, 539 (E.D.N.C. 1993)).

RPR moved for reconsideration of the March 31, 1998 opinion and order, and after oral argument on June 5, 1998, the Court ordered that a hearing be held so that the parties could present testimony from experts in French law as to the scope of the French patent agent's secrecy obligation and the extent of any evidentiary privilege. In July 1998, the parties agreed to identify the witnesses and provide copies of documents to be relied on by the witness, including English translations, if any, two weeks in advance of the hearing (Letter from RPR to Bristol of 7/9/98, at 1).[3] Bristol then requested deposi-

---

1. The Court used the translation of Article 422–54 provided by RPR in its letter to the Court of 7/21/97, at 5, Ex. B. The Court used the translation of Article 378 provided in *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1170 (D.S.C.1974). *See* 1998 WL 158958, at *1–*2.

2. The Court used the translation of Article 12.3 provided by Bristol's letter to the Court of 2/23/98, at 3. *See* 1998 WL 158958, at *2.

3. Also, in June 1998, the Court ordered Bristol to produce to the Court copies of Mosher correspondence produced by RPR in discovery, and ordered RPR to produce for *in camera* inspection the documents in the in-house French patent agents' files for which it was claiming privilege, together with a copy of its privilege log. The *in camera* inspection revealed that the French patent agents had not acted under the authority and control of U.S. patent attorney Mosher when preparing the patent application for the '011 patent, and that Mosher had not been asked for legal advice. The Court was troubled that its February 8, 1998 opinion and order requiring RPR's privilege log to identify the patent or patent application and prior art which was the subject of a privileged matter had not been com-

tions of RPR's expert witnesses. RPR opposed depositions stating, "The hearing concerns a pure issue of French law as to which the parties already have submitted extensive briefs, supported by evidentiary affidavits," and "the issue that is the subject of the hearing is already narrow and focussed" (Letter from RPR to the Court of 9/16/98, at 2). The Court denied Bristol's request for depositions "on the understanding that the experts called will not depart from the points raised in their prior statements" (Memo Endorsement of Letter from RPR to the Court of 9/16/98).

Neither party complied with the agreement that documents be exchanged two weeks exchange prior to the December 2, 1998 hearing. On November 25, 1998, RPR supplied Bristol with a list of seventeen French laws, statutes, decrees, ordinances and disciplinary rules on which it intended to rely (Letter from RPR to Bristol of 11/25/98, at 1–2). French texts and partial English translations were provided by RPR on November 30, 1998 (Letter from RPR to Bristol of 11/30/98, at 1). For its part, Bristol did not provide copies of the exhibits on which it intended to rely until November 30, 1998 (*id.*).

### EVIDENCE OF FOREIGN LAW PRESENTED ON MOTION FOR RECONSIDERATION

I. *Testimony of Judge Jacques Dragne*

At the hearing held on December 2–3, 1998, RPR did not rely on any of the French lawyers from whom it had submitted declarations. Instead, RPR submitted a new witness, Judge Jacques Dragne, from whom no prior declaration had been received, thereby circumventing the purpose and intent of the Court's order of September 17, 1998, which denied pre-hearing depositions upon RPR's representation that "there seems to be no possibility of 'surprise'" (Letter from RPR to the Court of 9/16/98, at 2). The Court

allowed Judge Dragne to be called, however, since counsel for RPR stated that his position would be consistent with RPR's previous filings with the Court (Tr. at 9).[4]

Jacques Dragne has been a Judge of the Court of Appeal in the City of Rouen since 1992. He hears appeals in commercial matters, admiralty law, contract law and banking law. In his judicial position, Judge Dragne deals with copyright, trade dress and trademark litigation. Though he does not have jurisdiction over patent suits (Tr. at 17–19), previously, he had been an attorney for twenty-three years with the National Institute for Industrial Property, where he rose to the post of deputy general director and worked on laws and regulations relating to patent agents and their secrecy obligations (Tr. at 15, 52, 58, 60, 62). As a civil servant and a Judge, Judge Dragne has been disqualified from acting as an industrial property counsel (the modern term for a French patent agent), but he is registered on the list of persons qualified in industrial property, and if he ceased being a Judge, he could immediately become an industrial property counsel. The Court found Judge Dragne qualified as an expert on French law pertaining to the secrecy obligations and evidentiary privilege applying to French patent agents.

Judge Dragne testified that French law is organized according to a hierarchy of norms, in which the French constitution constitutes the supreme law, followed by ratified international treaties, statutes ("loi"), government decrees ("décrets") and, finally, ministerial or interministerial orders ("arrêtés"). Each norm must conform to the superior norms in the hierarchy (Tr. at 29–33).

Judge Dragne testified that Article 378 of the French Penal Law, covering breaches of professional secrecy, was adopted in the nineteenth century and effective until 1994 (Tr. at 38–40). Article 378 states:

Doctors, surgeons and other health practitioners, as well as pharmacists, midwives

---

plied with and that the privilege log had, at least in some cases, obfuscated the subject matter, evidently to prevent any Bristol challenge to the documents contained in the log. *Bristol–Myers v. Rhône–Poulenc Rorer, Inc.*, No. 95 CIV. 8833(RPP), 1998 WL 474206, at *2 (S.D.N.Y.

Aug. 12, 1998), *pet. for writ of mandamus denied,* MISC. NO. 560, 1998 WL 879127 (Fed.Cir. Dec. 2, 1998).

4. "Tr." refers to the transcript of the December 2–3, 1998 hearing.

and other persons, who by status or profession, or through temporary or permanent duties receive as a depositary secrets revealed to them, and who disclose such secrets, except in cases where they are compelled or authorized by statute to provide information, shall be punished by imprisonment from one month to six months and a fine ranging from 50 000 (500 F) to 300 000 francs (3 000 F).

(RPR Ex. 5).[5] This Article was replaced by Articles 226–13 and 226–14 of the New Criminal Code, which were adopted in 1992 and effective as of January 1, 1994 (Tr. at 40). Article 226–13 states the following general rule:

The disclosure of information which is secret in nature by a person who is a depositary of such information by either status or profession, by virtue of his duties or temporary mission, is punished by imprisonment of one year and a 100 000F fine.

(RPR Ex. 6). Article 226–14 creates the following exceptions to this general rule:

Article 226–13 is not applicable in cases where the statute imposes or permits the disclosure of the secret. Moreover, it is not applicable to:

(1) Whoever informs legal, medical or administrative authorities of ill-treatment or abuse of which he had knowledge and which was inflicted on a fifteen year old minor who is unable to protect himself by virtue of his age or physical or mental state;

(2) A doctor who with the agreement of the victim brings to the knowledge of the Public Prosecutor the ill-treatment that he observed during the exercise of his profession and which allows him to presume that sexual assault of any nature has been committed.

(RPR Ex. 7). Judge Dragne stated that certain statutes "in some very specific cases put aside professional secrecy," including statutes on banking law and accounting law, and that professional secrecy can be put aside only by a statute, and not by any other type of legal norm (Tr. 100–01). He ac-

knowledged that statutes permit the French government to effect seizures in tax and customs investigations, and stated that these seizures *"essentially* consist of seizing the infringing product" (Tr. at 102–03) (emphasis added).

The French word in Articles 378 and 226–14 translated by RPR and Judge Dragne as "statute" is the term "loi" (RPR Exs. 5, 7 (original French)). Judge Dragne acknowledged that in common parlance, the term "loi" is often used to designate the entirety of French law and to cover all legal norms (Tr. at 189). However, he noted that the term "loi" is defined in the French Constitution to refer solely to statutes enacted by parliament, and he opined that the drafters of Article 226–14 likely used the word "loi" in this narrow sense (Tr. at 189–90). According to Judge Dragne, if the drafters of Article 226–14 intended to refer to the totality of the "loi," they would have used the term "lois and regulations" (Tr. at 189–90).

Judge Dragne testified about the organization of the patent agent profession both before and after the fundamental shift in the profession's organization in 1990. The profession of "patent counsel" ("conseil en brevets d'invention") was first organized by statute in 1965 by Decree No. 65–921 (Oct. 29, 1995) (RPR Ex. 8). This decree provided for a list of persons having the title of patent counsel to be maintained by the National Institute of Industrial Property (*id.*, Art. 1; Tr. at 47). In 1971 the French Parliament approved Act No. 71–1130 (Dec. 31, 1971) (RPR Ex. 9), which provided that the organization and disciplinary system of the newly organized profession would be established by a further decree (Tr. at 49–50). Decree No. 76–671 (July 13, 1976) (RPR Ex. 10) was adopted pursuant to this Act (Tr. at 51). This decree states that the Association of Patent Counsels within the National Industrial Property Office "establishes its internal rules and regulations, which may take effect only after they have been approved by joint decision of the Minister of Justice, and the

---

**5.** The translations contained in this opinion and order are those provided by the parties, without

any alteration.

Minister for Industrial Property" (RPR Ex. 10, Art. 15; Tr. at 52).[6]

The internal bylaws of the National Association were duly ratified in accordance with Decree No. 76–671 by a Regulation (Arrêté) dated September 8, 1977 (RPR Ex. 11; Tr. at 52–57). These ratified bylaws state, with no elaboration, that "[t]he members of the association must observe ... [r]espect for professional secrecy" (RPR Ex. 11, Art. 5(1)). Judge Dragne testified that "[t]his professional secrecy resulted directly from Article 378 of the Criminal Code" and did not add any further specificity to the secrecy obligation contained in Article 378 (Tr. at 56–57).

The patent counsel profession was reorganized in 1990. A new class of professional, the "industrial property counsel" ("conseil en propriété industrielle") was created by Act No. 90–1052 (Nov. 26, 1990) (RPR Ex. 12) (Tr. at 59). This class was defined to include professionals previously called "patent counsel," who were usually trained as engineers, as well as professionals with legal training who worked in trademarks and industrial design (Tr. at 59). The Act specified that decrees would determine, *inter alia*, "[t]he rules of the code of professional ethics applicable to industrial property counsels" (RPR Ex. 12, Art. 45).

A decree specifying such professional ethics was adopted in 1992, Decree No. 92–360 (April 1, 1992) (RPR Ex. 14; Tr. 64). This decree, which was codified without changes in the French Code of Intellectual Property (RPR Ex. 15, Art. R 422–54; Tr. 67–69), states that covered professionals "[s]hall observe professional secrecy: this secrecy applies particularly to the consultations he provides to his client, as well as professional correspondence and all documents prepared on this occasion" (RPR Ex. 14, Art. 22; Tr. 66–67). This decree also states, in language similar to the prior Decree No. 76–671 (RPR Ex. 10, Art. 15), that the National Association of Industrial Property Counsels "shall establish its own internal bylaws. These become effective following the joint approval of the Lord Chancellor, the Minister of Justice and of the Minister in charge of Intellectual Property" (RPR Ex. 14, Art. 17; Tr. at 120–21).

Subsequent to the 1992 decree, the National Association of Industrial Property Counsels adopted internal bylaws which were duly approved by Regulation (Arrêté) dated July 29, 1994 (RPR Ex. 16; Tr. at 117–18). Article 12.3 of these regulations governs professional secrecy and states:

> The industrial property counsel observes professional secrecy; in every instance, the opinions sent by an industrial property counsel to his/her client or intended for the latter and the correspondence exchanged between the client and his/her industrial property counsel are covered by professional secrecy.

> The industrial property counsel, by reason of the professional secrecy to which he/she is bound, must:

> — accept testifying on what he/she might know about his/her clients or professional matters only in the cases required by law;

> — refuse to communicate documents and records of his client to anyone other than the parties themselves, their heirs or beneficiaries or their agents, or anyone authorized by law or by legal decision, on proof of their identity and capacity.

Professional secrecy is not opposable to persons legally authorized to conduct legal, administrative or customs investigations, nor to the courts.

In cases of investigations, inquiries and legal, customs or disciplinary proceedings and, in particular, searches and seizures, relating to his/her professional activity, the industrial property counsel notifies the president of the association, so that the latter or his/her representative may assist him/her and give him/her his/her cooperation in order to ensure respect for professional secrecy, within the framework, in

---

**6.** Although the translation of Decree 76–671 submitted to the Court uses the term "National Industrial Property Office," it appears that the entity being referred to is the National Institute of Industrial Property. The French term used in Decree 76–671 is "l'institut national de la propriété industrielle" (RPR Ex. 10 (original French)).

particular, of the provisions of the Code of Criminal Procedure.

(RPR Ex. 16, Art. 12.3). Judge Dragne had left the National Institute of Industrial Property and was serving as a Judge before these regulations were adopted, and he did not participate in the drafting of the text (Tr. at 73). The first time that Judge Dragne read Article 12.3 was in connection with this litigation, approximately one-and-one-half months before the hearing (Tr. at 121–22). Judge Dragne opined that Article 12.3 only governs relations between industrial property counsel and their professional association, and that in cases involving third parties, Articles 226–13 and 226–14 of the New Criminal Code and Decree No. 92–360 (which was codified in the Intellectual Property Code) provide the governing framework (Tr. at 77).

Judge Dragne also testified about Articles 10 and 11 of the French Code of Civil Procedure, which provide for the court-ordered disclosure of documents in circumstances where there is no "lawful impediment" or "legitimate grounds" for nondisclosure. Article 10 states:

> Every individual is obligated to assist the justice system with a view to determining the truth.
>
> An individual who without legitimate grounds evades this obligation when he/she has been legally required to perform it may be compelled to perform it, if necessary under pain of civil fine or penalty, without prejudice to damages.

(RPR Ex. 17). Article 11 applies specifically to the parties to a litigation and states:

> The parties are obligated to assist in investigative measures unless the judge draws an inference from an abstention or a refusal.
>
> If one party is in possession of a piece of evidence, at the request of the other party the judge may order him to produce it, if necessary penalty [sic]. At the request of one of the parties he can request or order, if necessary under the same penalty, the

production of any and all documents held by third parties if there is no lawful impediment.

(RPR Ex. 18). Judge Dragne testified that there is no difference between the standard in Article 10 (focusing on "legitimate grounds" for nondisclosure) and the standard in Article 11 (focusing on the existence of a "lawful impediment" to disclosure) (Tr. 84). Judge Dragne stated that in his opinion, a professional secrecy obligation would constitute a legitimate grounds for nondisclosure and a lawful impediment to disclosure (Tr. at 85–86). When asked to give examples of court decisions in which professional secrecy had been considered a lawful impediment, Judge Dragne cited a decision involving communications between an archbishop and a husband about the husband's wife, and cited generally cases involving medical secrecy and the confidentiality of client correspondence exchanged with lawyers (Tr. 87–88). Judge Dragne testified that he was unaware of any court decision ordering the production of documents subject to professional secrecy from the files of an in-house patent counsel, though he also testified that he was unaware of any court decision refusing to order such production (Tr. at 80, 186, 190). Judge Dragne also testified that in French civil patent infringement cases, there is no issue of good faith or bad faith, and that it would therefore be irrelevant whether or not an infringer had received legal opinions adverse to its position regarding the infringement (Tr. at 129–31).

Judge Dragne testified that when a court desires to seize evidence, "[t]he bailiff plays a part after having been authorized by the tribunal, and the tribunal will then check that he did his duty in the proper manner" (Tr. at 103). Judge Dragne stated that the bailiff generally will not seize a document covered by professional secrecy, and that if he does so inadvertently, the document will be put aside or presented to an expert to determine whether it should be disclosed or not disclosed (Tr. at 96–97, 104).[7]

---

7. Judge Dragne testified that he was unaware of any infringement seizure that had been annulled because a seized document was covered by professional secrecy (Tr. at 104). Judge Dragne, in his capacity as a judge, had ruled in one case on the propriety of a trademark infringement seizure. He acknowledged on cross-examination that he had no experience with criminal patent

Judge Dragne opined that if a client gives the facts concerning an infringement to an industrial property counsel and there is no other source for the facts, the judge cannot obtain these facts and cannot order the counsel to communicate the documents that were given to him (Tr. at 195). Judge Dragne based this opinion on the most recent decree concerning the professional secrecy obligations of intellectual property counsel, Decree No. 92–360 (which became codified as Article R 422–54 of the Intellectual Property Code) (RPR Ex. 14, discussed *supra* p. 194).

Judge Dragne testified that "the counsel in industrial property is an independent professional," and that "independent" means "they offer their services to any person that asks for it" (Tr. at 108). He then testified that the National Institute of Industrial Property maintains two lists of persons: one that records all persons qualified in industrial property, and one that lists the subset of qualified persons who are independent and offer their services to the public (Tr. at 111). Judge Dragne testified that only persons whose names appear on the latter list bear the title "industrial property counsel" and are subject to the specific regulations of that profession, such as Decree No. 92–360 and Article 12.3 (Tr. at 111–12, 115, 117, 177–78, 196).[8] Judge Dragne offered contradictory testimony about whether Articles 226–13 and 226–14 of the New Criminal Code would apply to a person who was qualified as an industrial property counsel but not registered on the second list as a person practicing his or her profession with the requisite degree of independence. On direct examination, Judge Dragne testified that Articles 226–13 and 226–14 apply to all professionals (including secretaries, nurses, pharmacists and tax advisors) and would apply to persons merely qualified in industrial property (Tr. at 113–17). On re-cross-examination, however, he

testified that Articles 226–13 and 226–14 generally would not apply to salaried employees who do not bear the title "industrial property counsel" (Tr. at 205–05).[9]

During the hearing, RPR stipulated that Mr. Pilard and Mr. Savina are on the first list maintained by the National Institute of Industrial Property (of persons qualified in industrial property) but not on the second list of persons who bear the title "industrial property counsel" (Tr. at 171). RPR raised the point that Savina and Pilard are both licensed to practice with the European Patent Office (the "EPO") (Tr. at 171). Judge Dragne testified that if Pilard and Savina are authorized agents with the EPO, they could claim professional secrecy, because the EPO employs no distinction between salaried employees and independent professionals (Tr. at 199). Judge Dragne stressed that to be authorized agents with the EPO, Pilard's and Savina's role could not be limited to merely executing the orders of their superiors (Tr at 199–200). Counsel for Bristol objected that Judge Dragne had not been offered as an expert witness on EPO law and that no EPO law or statute had been submitted to the Court (Tr. at 201).

## II. *Testimony of Mr. Therry Mollet–Vieville*

The sole witness called by Bristol was Mr. Therry Mollet–Vieville, a French avocat with twenty-eight years of experience who deals exclusively with intellectual property matters. (Tr. at 138–39). Mr. Mollet–Vieville stated he had regularly considered Article 378 of the French Penal Code and Articles 226–13 and 226–14 of the New Criminal Code in the course of advising his clients, and the Court found him qualified as an expert on French law (Tr. at 139, 145–46).

---

investigations, which were re-established in 1990, and that he was not aware of any authorities concerning the scope of investigation in criminal patent investigation suits (Tr. at 126–27).

8. Similarly, a person qualified as an avocat (lawyer) does not have the rights, powers and authority of an avocat if he or she is solely employed by one company (Tr. at 113).

9. On re-cross-examination, Judge Dragne also contradicted his earlier testimony about the application of Article 226–13 to secretaries, stating that Article 226–13 would not apply to a secretary "because she finds herself under the entire suggestion or dependence of her employer" (Tr. at 191–92).

Mr. Mollet–Vieville contested Judge Dragne's understanding of Article 378 and Articles 226–13 and 226–14. As previously discussed, *see supra* pp. 193–194, Articles 378 and 226–14 punish breaches of professional secrecy except where disclosure is imposed or permitted by "loi." While Judge Dragne and RPR translated the word "loi" to mean "statute," Mr. Mollet–Vieville testified that "la loi" is the word for "law" in French, and though it sometimes refers only to statutes, it can also refer to any norm, including a decree (decret) or regulation (arrêté) (Tr. at 147, 172–75).[10] Mr. Mollet–Vieville opined that if any norm authorized the disclosure of a secret, there would be no criminal fault under Articles 226–13 and 226–14, or under the prior Article 378 (Tr. at 147). Mr. Mollet–Vieville testified that an investigation by a judge or a French court is authorized under the "loi," and that the disclosure of professional secrets to a court acting pursuant to its powers of investigation would not result in criminal liability under Articles 226–13 and 226–14 (Tr. at 148, 151)

Mr. Mollet–Vieville opined that the exception to secrecy contained in Article 12.3 of the ratified internal regulations of the National Association of Industrial Property Counsels is consistent with Article 226–14 (Tr. at 149–50).[11] According to Mr. Mollet–Vieville, that part of Article 12.3 which states, "Professional secrecy is not opposable to persons legally authorized to conduct legal, administrative or customs investigations, nor to the courts," contemplates an exception to secrecy no broader than that contained in Article 226–14 (Tr. at 151).

Mr. Mollet–Vieville disagreed with Judge Dragne about the scope of a judge's power to compel production under Articles 10 and 11 of the French Civil Code. Mr. Mollet–Vieville stated that a judge could override secrecy obligations which might form a legitimate impediment to disclosure, because the judge always has the power to say "I need this information for the case" (Tr. at 152). Mr. Mollet–Vieville suggested that when a bailiff, acting pursuant to court order, seizes documents in a patent infringement case, he will seize even confidential documents if they are related to the case (Tr. at 157, 178–79). He further testified, according to his knowledge of several cases in the field, that the judge "will always authorize the disclosure of the confidential documents which are related to the infringement of the patent," and that the judge is specifically empowered to do so in patent infringement cases by Article L615.5, a statute not mentioned by Judge Dragne (Tr. at 157–58, 172). Mr. Mollet–Vieville testified, however, that in his personal experience he had never seen a bailiff seize any documents covered by professional secrecy (Tr. at 179–80).

Mr. Mollet–Vieville stated that while the French avocat has the right to refuse to answer a judge who inquires into professional secrets, the French industrial property counsel has no such right (Tr. at 160–61). He acknowledged that never in his experience had a judge asked a question requiring an industrial property counsel to divulge professional secrets, and he opined that judges do not press such questions out of courtesy to French industrial property counsels, and in view of the fact that an industrial property counsel's professional advice would seldom be relevant to a civil patent infringement case (Tr. at 164–65).[12]

### III. Material Submitted After the Hearing

By letter dated December 17, 1998, RPR furnished to the Court new exhibits containing EPO regulations for EPO professional representatives. The specific regulations submitted are entitled: (1) Regulation on the Establishment of an Institute of Professional Representatives Before the European Patent Office, effective October 21, 1977, which au-

---

10. Mr. Mollet–Vieville did acknowledge, however, that lower norms must be consistent with higher norms (Tr. at 173).

11. Mr. Mollet–Vieville, like Judge Dragne, first inspected Article 12.3 in connection with this litigation (Tr. at 149).

12. Mr. Mollet–Vieville pointed out that because there is no doctrine of estoppel under French law, an attorney for a party may say one thing one day, and take a contrary position on another day, and thus the advice of an industrial property counsel would be irrelevant to the judge's investigation of patent infringement (Tr. at 164).

thorized the creation of a list of professional representatives who are members of the Institute of Professional Representatives Before the European Patent Office; and (2) the Regulation on Discipline for Professional Representatives, effective October 21, 1977, which states, in Article 2:

A professional representative shall be bound not to disclose information accepted by him in confidence in the exercise of his duties, unless he is released from this obligation.[13]

Bristol also submitted an Announcement of the List of Professional Representatives Before the European Patent Office, as of January 17, 1978, which includes the names Mr. Pilard and Mr. Savina.

On December 18, 1998, Bristol responded to RPR's letter of December 17, 1998. Bristol opposed RPR's offer of new exhibits after the hearing as a violation of the mutually agreed-upon pre-hearing procedure, but it also took the position that the EPO regulations submitted did not establish an evidentiary privilege for EPO professional representatives, but only a duty of secrecy. Bristol argued that: (1) Article 2 of the EPO Regulation on Discipline is similar to Article 12.3 of the internal regulations of the National Association of Industrial Property Counsels, in that both contemplate disclosure of professional secrets to the courts; (2) there is nothing in French law that recognizes any EPO privilege; and (3) there is nothing in the EPO regulations which suggests that they can override French law or policy (or the internal policies of any other country) (Letter from Bristol to the Court of 12/18/98, at 2). Bristol stated that RPR's position would mean that the EPO has disabled the courts of each EPO representative's home country from compelling disclosure (id.). Bristol highlighted that Judge Dragne, RPR's witness, knew of no cases in which the EPO secrecy regulations had been applied (Tr. at 200). Bristol argued, further, that RPR's position is undercut by an article which RPR itself had previously submitted to the Court (Letter from RPR to

the Court of 5/5/98 (Tab A)). This article states: "In cases where privilege issues have arisen in relation to European patent attorneys ... U.S. courts have turned to the privilege law of the patent attorney's country of practice rather than the European standard." Daiske Yoshida, Note, The Applicability of the Attorney–Client Privilege to Communications with Foreign Legal Professionals, 66 Fordham L.Rev. 209, 226 (1997) (citing Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. 298, 306–07 (E.D.N.Y.1992), which protected U.K. patent agents in a proceeding under European Patent Convention because the 1977 U.K. Patent Act specifically provided for such protection).

On December 29, 1998, Bristol submitted to the Court an article by Axel Casalonga, former President of the National Industrial Property Counsels Association. The author states:

Unlike for Attorneys [sic], correspondence between an Industrial Property Counsel and his/her client may be released to the administration or to customs officials within the context of a legal investigation or after a Court order, or to a legally-authorized person. An Industrial Property Counsel cannot oppose such a violation of professional secrecy, even with the intervention of the President of the National Industrial Property Counsel Company, as the latter can only assist in enforcing professional secrecy.

Axel Casalonga, Secrecy and the Industrial Property Professions, The Industrial Property Counsel Letter (June 1995), at 5. The author also states that in the course of infringement seizures, an industrial property counsel for the patentee acts as a technical assistant to the legal officer designated to perform the search, and thus may have access to any secret communications of the alleged infringer in the possession of the infringer's industrial property counsel. Id. at 6–7. The author states that transmission of such information to the patentee would, however, violate the counsel's professional

---

**13.** This Regulation on Discipline and its professional secrecy provision had been cited in a footnote in one of RPR's previous submissions to the Court (Letter from RPR to the Court of 5/5/98, at p. 8 n. 6).

obligations of restraint, integrity and delicacy. *Id.* at 7. The author states that if confidential documents are seized, the court will designate an expert to sort out those confidential documents which help establish proof of infringement, which may be disclosed, from those confidential documents which are not necessary in establishing such proof, which are not disclosed to the plaintiff. *Id.*

### DISCUSSION

Much of the testimony and many of the affidavits offered by the experts on French law proceed on the misperception that in the United States, the attorney's obligation to hold secret the materials and documents pertaining to clients is the same as his or her obligation pursuant to the attorney-client privilege to withhold certain material from court proceedings.

■ American law distinguishes between the lawyer's obligation of confidentiality and the evidentiary privilege for confidential attorney-client communications. *See* Christopher B. Mueller & Laird C. Kirkpatrick, *Modern Evidence*, § 5.2 (1995). Under the former,

> the lawyer may not use or disclose confidential client information … if there is a reasonable prospect that doing so will adversely affect a material interest of the client of if the client has instructed the lawyer not to use or disclose the information.

Restatement (Third) of the Law Governing Lawyers § 112(1)(a) (Proposed Final Draft No. 1 1996).[14] Court process can, however, require disclosure of such information unless it is subject to the attorney-client privilege. For instance, regardless of a client's instructions, the manner and amount of payment for an attorney's services must be disclosed by an attorney in court hearings or discovery, even if the attorney would normally be under a duty to keep such information confidential. *Lefcourt v. United States,* 125 F.3d 79, 88 (2d

Cir.1997), *cert. denied,* ——— U.S. ———, 118 S.Ct. 2341, 141 L.Ed.2d 712 (1998).

■ The attorney-client privilege applies only in the limited circumstances. As classically formulated by Dean Wigmore:

> (1) Where legal advice is sought (2) from a professional legal advisor in his capacity as such, (3) the communication relating to that purpose, (4) made in confidence (5) by the client [or attorney], (6) are at his instance permanently protected (7) from disclosure by himself or the legal advisor, (8) except if the privilege is waived.

8 Wigmore, Evidence § 2292, at 554 (McNaughton rev. ed.1961) [hereinafter Wigmore]; *see also United States v. Construction Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.), *cert. denied,* 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996); *In re Horowitz,* 482 F.2d 72, 80–81 & n. 7 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973). In other words, the attorney-client privilege applies only to communications between privileged persons in confidence for the purpose of obtaining or providing legal assistance to the client, Restatement (Third) of the Law Governing Lawyers § 118 (Proposed Final Draft No. 1 1996), and only these communications are exempt from disclosure at hearings or in discovery, *id.* § 135; *see generally id.,* Chapter 5 Introductory Note, at 265 ("The immediate remedial consequence of the privilege—excluding evidence at hearings and depositions—is only one aspect of the rights and liabilities of client confidentiality.").

■ Many of the experts on French law do not appear to have been advised that the attorney-client privilege in the United States is separate from the duty of secrecy and that only in the subset of circumstances set forth above does the attorney-client privilege exempt documents from court process. It is important also to recognize that under the law of this country a communication covered by attorney-client privilege is entitled to protection regardless of whether the proceeding is civil, criminal or administrative, whether

---

**14.** Confidential client information is defined to as defined to consist of "information relating to that client, acquired by a lawyer or agent of the lawyer in the course of or as the result of representing the client, other than information that is generally known." Restatement (Third) of the Law Governing Lawyers § 111 (Proposed Final Draft No. 1 1996).

the question arises in grand jury, in discovery or at trial, unless the client has waived the privilege, *id.* § 135; 8 Wigmore § 2327. The privilege cannot be overridden because a tribunal determines that the need for disclosure in a particular case outweighs the need for confidentiality. Restatement (Third) of the Law Governing Lawyers § 118 cmt. c & Reporter's Note (Proposed Final Draft No. 1 1996); *id.* § 136 cmt. d (contrasting qualified work-product protection and the attorney-client privilege).

■ In this case, the submissions of the experts on French law do establish that a French industrial property counsel, like an attorney in the United States, has an obligation to keep secret confidential communications entrusted to him by his client (Affirmation of Pierre Vèron ¶ 3, Letter from RPR to the Court of 4/17/98 (Tab A) [hereinafter "Vèron Affirm."]; Declaration of Daniel Hangard ¶ 2, Letter from RPR to the Court of 5/5/98 (Tab C) [hereinafter "Hangard Decl."]; Affidavit of Jean–Michel Wagret ¶¶ 5–11, Letter from RPR to the Court of 5/5/98 (Tab D) [hereinafter "Wagret Aff."]).[15] However, these submissions do not establish that the French industrial property counsel enjoys an evidentiary privilege comparable to that afforded attorneys in the United States.

In French civil patent litigation, the good faith or bad faith of the infringer is not an issue (Tr. at 129–31). Generally, there is no testimony and no trial, and the case is decided on the basis of documentary evidence and the arguments of the avocats (Tr. at 128–29). The relative infrequency of court orders to disclose confidential documents in the possession of French industrial property counsels is explained by the fact that the intent of the alleged infringer and the legal advice received by the infringer are not relevant issues in French civil patent infringement litigation (Tr. at 129–31, 164–65). Even so, in a

French patent infringement case, the patentee may obtain an ex parte order from the judge to have a bailiff search for and view confidential communications between an alleged infringer and the infringer's industrial property counsel (Wagret Aff. ¶ 14–16), and the bailiff is typically accompanied by the patentee's industrial property counsel, who identifies the evidence of infringement (*id.* ¶ 14; Casalonga, *supra* p. 20, at 6). Documents containing evidence of infringement and confidential matters will be seized and held for court review (Vèron Affirm. ¶ 16; Casalonga, *supra* p. 21, at 7; Tr. at 96–97, 157, 178–79). The patent agent must respond to a judge who inquires into professional secrets, while the French avocat can decline to answer (Tr. at 160–61; Mollet–Vieville Decl. ¶ 4). Furthermore, judges or agencies investigating criminal, customs or tax offenses may seize confidential matters in the possession of a French industrial property counsel (Hangard Decl. ¶ 4), whereas the United States attorney-client privilege is not similarly qualified.[16] The French practice of infrequently invading industrial property counsel secrecy in civil infringement cases, where intent is not an issue, and of suspending secrecy obligations in criminal investigations (Vèron Decl. ¶¶ 12–15), is not consistent with the existence of an evidentiary privilege comparable to the United States attorney-client privilege.

Based on the briefs and letters submitted by the parties, and the hearing held on December 2–3, 1998, the Court declines to change its ruling of March 31, 1998. RPR has failed to establish that there exists under French law a patent agent privilege comparable to the United States attorney-client privilege, or that Pilard and Savina are entitled under French law to any secrecy protection due to their status as industrial property agents. RPR has stipulated that Pilard and

---

**15.** Apparently, the obligation of confidentiality imposed on the French industrial property counsel apparently does not apply to the client and he is required to provide information to the Court. Article 226–13 of the French Criminal Code only applies to a person who is the *recipient* of secret information through his profession (Declaration of Therry Mollet–Vieville ¶ 1, Bristol letter to the Court of 6/11/98 (Tab A) [hereinafter "Mollet–Vieville Decl."]). No expert on French law has

claimed that a French industrial property counsel's communication may be exempt from seizure when it is in the possession of his client.

**16.** Judge Dragne, RPR's witness, stated that customs seizures "*essentially* consist of seizing the infringing product" (Tr. at 102) (emphasis added).

Savina are salaried employees of RPR who do not offer their services to the public on a confidential basis, and has not shown that Pilard and Savina take inventions other than in the course of their employment. As recognized by RPR's own witness, Judge Dragne, Pilard and Savina are not afforded the title of industrial property counsel under French law and are not covered by French secrecy laws.

The EPO regulations relating to professional representatives contain a disciplinary rule of secrecy, but this rule of secrecy does not confer the equivalent of the United States attorney-client privilege on EPO representatives. The disciplinary rule of secrecy is a part of the "provisions governing the disciplinary power to be exercised by the Institute of Professional Representatives and by the European Patent Office on professional representatives" (Letter from RPR to the Court of 12/17/98 (Tab 3), preamble). Violation of the duty of secrecy may result in internal disciplinary measures, including a warning, a reprimand, a fine, or temporary or permanent deletion from the list of professional representatives (*id.*, Art. 4). It is explicitly provided that "[w]hen proceedings against a professional representative are pending before a Disciplinary Body, the representative shall supply all necessary information and, on request, submit his files to the Body, except in so far as this would be in conflict with his obligation to professional secrecy" (*id.*, Art. 18). The phrase "Disciplinary Body" is defined earlier in the regulations and refers only to internal EPO bodies (*id.*, Art. 5). The regulations do not speak to whether or not an EPO professional representative must disclose professional secrets to courts or other tribunals. Moreover, the regulations contemplate that a professional representative may be "released from this obligation" of secrecy (*id.*, Art. 2). Ac-

cordingly, there is no basis to conclude that the EPO regulations create an evidentiary privilege where French law does not.[17]

RPR has not shown a privilege to withhold documents which extends to Pilard or Savina. Therefore, RPR's motion for reconsideration is denied and RPR is ordered to produce all communications or documents in Pilard's and Savina's files relevant to this matter which were not prepared pursuant to the authority of an American patent attorney.

IT IS SO ORDERED.

---

17. Furthermore, "[i]n cases where privilege issues have arisen in relation to European Patent Attorneys ... U.S. courts have turned to the privilege law of the patent attorney's country of practice rather than the European standard," Daiske Yoshida, Note, The Applicability of the Attorney–Client Privilege to Communications with Foreign Legal Professionals, 66 Fordham L.Rev. 209, 226 (1997), and RPR has not demonstrated that French law would give effect to an evidentiary privilege for EPO professional representatives. *Cf. Stryker Corp. v. Intermedics Orthopedics, Inc.*, 145 F.R.D. 298, 306–07 (E.D.N.Y. 1992) (United Kingdom patent agent privilege law explicitly covers EPO professional representatives). Judge Dragne, who spoke to the subject only briefly (Tr. at 199–201) testified from memory and was not qualified as an expert on EPO law.